DOWNEY, Judge.
Appellee, Hollywood Lodge #21, Fraternal Order of Police, brought suit on behalf of all police officers of the City of Hollywood for declaratory and injunctive relief against the City of Hollywood. Appellee was granted a final summary judgment which appellant contends was erroneous.
The thrust of appellee’s complaint is that the city has not been making proper contributions to the City of Hollywood Police Pension Fund because it has been improperly reducing its annual contribution to that fund by the amount which the pension fund receives from the one percent excise tax levied upon casualty insurance premiums covering property within the corporate limits of the City of Hollywood, pursuant to Chapter 185 F.S. 1973. This was an appropriate case for summary judgment as there was no genuine issue that the following are the material facts of this case.
The City of Hollywood has a police pension fund established by Chapter 69-1152, Special Acts of 1969. Under that chapter, as amended by a November 1973' referendum, the members of the pension fund are required to pay 7% of their salary into the pension fund. Pursuant to Chapter 185 F. S. 1973 the city levies a tax of 1% on casualty insurance premiums covering property in the city. Chapter 185 provides that the proceeds of the 1% levy must be used for the police pension fund. Thus, for fiscal 1973 the sources for funding the Police Pension Plan were: a) contributions from police officers, $142,000, b) State of Florida, Premium Tax levy pursuant to Chapter 185, supra, $103,000, c) fund investment income, d) City of Hollywood contribution, $296,000. If the 1% premium tax proceeds had not been paid into the plan the contribution from the city would have been $399,000 instead of $296,000.
The circuit court apparently based the judgment under review upon a finding that the appellant city was using the funds it *368 received pursuant to the tax levied on authority of § 185.08 F.S. “in violation of the legislative mandate as expressed in Section 185.01, Florida Statutes, and as interpreted by the Florida Supreme Court in the case of City of Miami v. Carter, 105 So.2d 5 (1958).” This finding and the circuit court’s entry of an injunction prohibiting appellants “from using any of the funds received pursuant to Chapter 185, Florida Statutes, to decrease the city’s liability to fund the Police Pension Plan,” together with the circuit court’s quotation of the following portion of Chapter 69-1152, § 2.-4:
“The money required to meet all obligations of this Pension Plan, over and above the personal contributions forthcoming from members, is hereby declared to be the liability and obligation of the City of Hollywood. Therefore, the City Commission of the City of Hollywood, Florida, shall budget annually, in the manner provided by law, to produce the amounts required to be contributed by said City to this system.”
lead us to believe that the court concluded that the city had a duty to furnish the difference between the amount necessary to maintain the pension fund and the amount the pertinent legislation required the police officers to pay into the pension fund.
We hold that this conclusion is erroneous and must be reversed because the city’s method of computing its required contribution was proper under the circumstances existing at the times pertinent to this case.
The appellate briefs reflect agreement between the parties on one matter: the judgment under review is substantially correct if the holding announced in City of Miami v. Carter, Fla.1958, 105 So.2d 5, applies to the present case.[1] However, our analysis of the Carter decision convinces us that none of its pronouncements supports the circuit court’s conclusion that the manner in which the appellant city was supplying money to the policemen’s pension fund was unlawful.
The facts of the two cases are entirely dissimilar. In the Carter case the pension for firemen and policemen ceased to exist when the city created a retirement system for all city employees, including firemen and policemen. On the same day the city abolished the separate retirement system (December 6, 1939), it adopted an ordinance levying a 1% tax on certain insurance policies under authority granted by Chapter 175, F.S. The city deposited the proceeds of that tax in the general retirement system, from which all city employees received pension payments.
A group of city firemen filed an action against the city seeking an accounting of funds the city received from the Chapter 175 1% tax during the period December 6, 1939-June 5, 1952. The firemen based their action on the ground that the city’s placing of the Chapter 175 tax funds into the general retirement system was a deprivation of their property without due process of law, since Chapter 175 required such funds to be held and administered for the sole use of firemen and their dependents.
The complaint asked the court to have the city pay the Chapter 175 tax money it received during the period December 6, 1939-June 5, 1952, plus interest, into the general retirement fund, “there to be held in a special fund and administered for the sole benefit of firemen members and their dependents, such benefits to be in addition to the benefits already provided for them under said retirement system.”
The city’s answer, among other things, asserted the city had received $434,946 in *369 Chapter 175 tax proceeds during the period December 6, 1939 through 1951. However, it also asserted that the city had paid for the benefit of firemen that amount plus $1,119,075 from the general retirement system, contending in essence that the firemen were entitled to no relief because under the city’s general retirement system the firemen had received more in benefits than the amount which they sought from the city in their accounting action.
The circuit court ruled that under Chapter 175 the city had the duty to place the Chapter 175 tax receipts sued for (which the court found amounted to $436,920.68) into a separate firemen’s pension fund (to be solely for the benefit of firemen and their dependents) within the general retirement fund. Moreover, the firemen were to receive the benefits of that special fund in addition to the benefits they received under the general retirement system.
On appeal the city urged that the circuit court’s judgment be reversed for the reason, among others, that the city had used the Chapter 175 tax proceeds properly, i. e., for the benefit of firemen and their dependents.
The Supreme Court stated the key appellate question to be: “whether a city can use the proceeds of the tax authorized under Chapter 175, F.S.A. for the benefit of all the members of the city relief or pension fund,” and answered it in the negative, thereby holding that the funds must be used exclusively for the benefit of firemen and their dependents.
We conclude that the Carter case announced the following rules:
(1) A city which levies a 1% tax on insurance premiums under authority of Chapter 175 (or Chapter 185) must place the proceeds of that tax into a special pension system or fund; the only city employees to whom pension payments may be made from that special system or fund are firemen (or policemen);
(2) The city may not use those proceeds to reduce the amount it must contribute to a general pension system it has set up for all city employees.
The present case involves only a special pension system for policemen; it does not involve a general pension system for all city employees. The appellant city has not intermingled receipts from Chapter 185 tax levies with any other funds nor has it used those receipts to reduce the contribution it must make to any general pension system for all city employees. Therefore, the trial court’s conclusion that the appellant city is using the Chapter 185 tax receipts “in violation of the legislative mandate as expressed in Section 185.01, Florida Statutes, and as interpreted by the Florida Supreme Court [in the Carter case]” is clearly erroneous, as is the injunction prohibiting the appellants “from using any of the funds received pursuant to Chapter 185, Florida Statutes, to decrease the city’s liability to fund the Police Pension Plan.”
As amended in 1959, Section 185.35, F. S., provides in section (1) that in order for municipalities with their own pension plans to participate in the distribution of the tax fund established in §§ 185.07-09, F.S., their retirement funds must meet standards provided in said section. One of said standards is provided in § 185.35(1) (j):
“Commencing on July 1, 1964, the municipality shall contribute to the plan annually an amount which together with the contributions from the police officers, the amount derived from the premium tax provided in § 185.08 and other income sources will be sufficient to meet the normal cost of the plan and to fund the actuarial deficiency over a period not longer than forty years.”
Thus it seems clear that to determine the amount for which the city is liable annual *370 ly, one begins by determining the sum of the police officers’ contributions and the premium tax proceeds the city received pursuant to Chapter 185 F.S. and the other income sources. Next, one' determines the additional amount necessary to meet normal costs of the plan and the amount necessary to fund the actuarial deficiency over the stated period. The latter amount should be the city’s annual additional contribution to the fund. The foregoing method of determining the city’s annual contribution will prevail unless the trustees of the pension plan elect the alternative method set forth in Section 185.35(2), which provides:
“When a municipality has a policemen’s retirement plan which meets the standards set forth in subsection (1), the board of trustees of the pension plan or the official pension committee or agency, may place the income from the premium tax in § 185.08 in its existing pension fund for the sole and exclusive use of their policemen (or for firemen and policemen where included), or may use said income to pay extra benefits to the policemen.”
If the trustees elect to place the income from the premium tax into its existing pension fund (as the trustees of the fund in the present case are doing), then the formula or method of contributions will remain as we outlined above. On the other hand, if the trustees elect to use the income from the premium tax to pay extra benefits to the policemen, then the city’s annual contribution would probably have to be increased to offset the elimination of the premium tax as a source for obtaining funds for the police pension plan.
The record fails to reflect that the trustees of the police pension plan have ever elected to use the proceeds from the annual premium tax to pay extra benefits to the policemen. Therefore, the city properly placed those proceeds into the policemen’s pension fund. The provision of the final judgment enjoining the city from using the annual premium tax proceeds in determining the annual amount of the city’s contribution to the pension plan violates the clear mandate of § 185.35 (1) (j) and is thus erroneous as an improper intrusion into the legislative domain. Cf. City of Miami Beach v. Kaiser, Fla.App.1968, 213 So.2d 449, 453. It therefore follows that the further provision of the final judgment authorizing the use of the premium tax money to offset the individual contributions of the policemen to the pension fund is also improper because that provision violates § 185.35(2) F.S.1973, and it too constitutes an improper intrusion into the legislative domain by making the payment of extra benefits from premium tax receipts mandatory rather than elective.
Accordingly, the judgment appealed from is reversed and the cause is remanded with directions to enter judgment for the appellants.
MAGER, J., and BASKIN, NATALIE, Associate Judge, concur.

. The Carter ease involved Chapter 175 F.S., not (as the present case does) Chapter 185 F.S. However, because of the similarities between the two chapters cases construing one are applicable to cases involving the other. Therefore the Carter case is relevant to the present case, but it does not control it.